*Maryland Property Management, LLC, et al. v. Helena Peters-Hawkins, et vir.*, No. 0278, September Term 2019.  Opinion by Salmon, James P. (Senior Judge, Specially Assigned)

**Landlord and Tenant** – the word "landlord," as used in Md. Code (2015 Repl. Vol.), Real Property Article § 8-216(a), means owner of the property leased or rented to another.

**Appeal and Error** – A trial judge has the discretion to grant a new trial on the ground that the evidence was insufficient to support the verdict even though at trial movant failed to raise that issue.  But, in determining whether to grant a new trial on that basis, a trial judge has almost boundless discretion not to grant a new trial based on insufficiency of the evidence, even though the result may have been different if a more timely objection had been raised.

**Landlord and Tenant** – Under Real Property Article § 8-216, a landlord may be held liable by changing the lock on the rental property prior to eviction or by entering the rental property prior to eviction and removing the tenant's personal property.

**Trial** – A party is not precluded from raising for the first time the issue of irreconcilably inconsistent verdicts in a post-trial motion.

Circuit Court for Baltimore City
Case No. 24-C-18-001445

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0278

September Term, 2019
_____

MARYLAND PROPERTY MANAGEMENT,
LLC, ET AL.,

v.

HELENA PETERS-HAWKINS, ET VIR.
_____

Reed,
Shaw Geter,
Salmon, James, P.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Salmon, J.
_____

Filed: January 28, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case has its origin in a Baltimore City Landlord/Tenant dispute. The tenants and appellees in this appeal are Helena Peters-Hawkins ("Mrs. Hawkins") and her husband, Charles Hawkins ("Mr. Hawkins"). The appellants are Maryland Property Management, LLC ("Maryland Property Management"), ANT Properties, LLC ("ANT"), and Ted Thornton, the managing member of Maryland Property Management, and owner of ANT.

On March 14, 2018, Mrs. Hawkins and her husband filed suit in the Circuit Court for Baltimore City against the three appellants. The complaint contained eight counts, but the circuit court granted summary judgment in favor of the appellants as to six of those counts. One of the two surviving counts (Count I) alleged a violation by all three appellants of Md. Code, (2015 Repl. Vol.), Real Property Article ("RP"), § 8-216(b), which reads, in material part, as follows:

> *In general.* – (1) Except as provided in paragraph (2) of this subsection, a landlord may not take possession or threaten to take possession of a dwelling unit from a tenant or tenant holding over by locking the tenant out or any other action, including willful diminution of services to the tenant.
>
> (2) A landlord may take possession of a dwelling unit from a tenant or tenant holding over only:
>
> (i) In accordance with a warrant of restitution issued by a court and executed by a sheriff or constable; or
>
> (ii) If the tenant has abandoned or surrendered possession of the dwelling unit.

Section 8-216(a)(2) defines the words "threaten to take possession" as "using words or actions intended to convince a reasonable person that the landlord intends to take imminent possession of the property in violation of this section."

Another surviving count in the complaint alleged a cause of action for common law conversion against all three appellants.

After extensive discovery was completed, the case was tried before a jury over a three-day period in the Circuit Court for Baltimore City. The jury set forth its verdicts as follows:

**COUNT I – Violation of Real Property Article Section § 8-216**

1. Do you find by a preponderance of the evidence that Theodore Thornton threatened to take possession of 4909 Morello Road, or took possession by locking the Plaintiffs out or by any other action, in violation of Real Property Article § 8-216?

    Yes __X__          No _____

2. Do you find by a preponderance of the evidence that Maryland Property Management, LLC or ANT Properties, LLC, is liable for violating Real Property Article § 8-216 based on either Mr. Thornton's actions or by any other actions?

    As to Maryland Property Management, LLC:

    Yes __X__          No _____

    As to ANT Properties, LLC:

    Yes __X__          No _____

3. If you answered yes to any of the above, what damages do you find for:

    Economic Damages $ 3,000.00

    Non-Economic Damages:

    Charles Hawkins: $ 5,000.00
    Helena Peters-Hawkins $ 10,000.00

2

## COUNT II – Conversion

4. Do you find that Plaintiffs have proven, by a preponderance of the evidence, that any of the Defendants converted any of Plaintiffs' property?

        As to Maryland Property Management, LLC:

        Yes _X_           No _____

        As to ANT Properties, LLC:

        Yes _X_           No _____

        As to Theodore Thornton:

        Yes _X_           No _____

5. If your answer is yes as to any of the Defendants mentioned in Question 4 above, what do you find for damages?

        Damages: $ 10,000.00
        [Total]    $ 28,000.00

All three appellants filed a motion for new trial and/or for judgment notwithstanding the verdict.

Both the motion for judgment notwithstanding the verdict and the motion for a new trial were denied. Mr. Hawkins and his wife filed a "Petition for Statutory Attorneys' Fees and Costs" pursuant to RP § 8-216(c)(1)(ii). As the title of their petition suggested, petitioners asked for attorneys' fees and costs incurred in bringing Count I of the lawsuit, i.e., the suit brought to enforce rights under RP § 8-216(b). After the appellants filed an opposition, a hearing was held concerning the petition. The circuit court, on March 5,

3

2019, filed a memorandum and order awarding appellees $66,880.00 in attorneys' fees and $1,713.39 in costs.

The appellants then filed this timely appeal in which they raise five issues, which we have reordered:

I. Whether the trial court erred in denying the Rule 2-519 motion of appellant ANT Properties, LLC, at the close of plaintiffs' case in chief, when plaintiffs presented no evidence that ANT was the landlord, or that ANT had engaged in any supposed acts of conversion.

II. Whether the trial court erred in denying appellant ANT's motion for a new trial and motion for judgment notwithstanding the verdict, with respect [to] the supposed identity of ANT as a landlord under RP § 8-216, there being no law or evidence to support a holding that ANT had been the landlord.

III. Whether the trial court erred in refusing to grant appellants' motion for a new trial with respect to any liability under RP § 8-216, as there was no evidence from which a jury could have inferred the necessary elements of that cause of action, the Hawkins family having remained living at the house for two weeks after the cancellation of the eviction.

IV. Whether the trial court erred in denying the motion for a new trial with respect to illogical and inconsistent jury awards of economic damages.

V. Whether the trial court erred in assessing attorney fees against defendants where the award of fees was a multiple of the underlying award of damages.[1]

---

[1] Appellees renewed a previously filed motion to dismiss this appeal. None of the reasons advanced by appellees for imposing the sanction of dismissal are persuasive and therefore the motion for dismissal shall be denied.

# I.

## UNDISPUTED FACTS

On November 12, 2016, Mr. Hawkins and his wife signed a one-year lease for a single family house located at 4909 Morello Road in Baltimore City ("the Property"). The term of the lease was from November 14, 2016 to November 30, 2017 and the rent was $1,550.00 per month. The first paragraph of the lease read:

1) NAMES OF LANDLORD AND RESIDENT(S):
a) Property Manager for Owner (Landlord): Maryland Property Management, LLC
b) Address to send rent payments: 40 York Rd., Suite 301, Towson, MD 21204
c) Resident(s)    Name: <u>Helena Hawkins</u>       SSN:_____
                  Name: <u>Charles Hawkins</u>      SSN:_____

Paragraph 9 of the lease provided:

**AGENCY** – <u>Landlord has authorized Maryland Property Management LLC to enter into this rental agreement on his/her behalf</u>, to receive and receipt for rent, and to do any and all other things necessary or desirable to administer or effectuate this agreement during Resident's occupancy. Rent shall be paid and all notices, requests or other communications shall be by or to Landlord through Maryland Property Management LLC at the address listed above. <u>Maryland Property Management LLC has full authority from the owner to manage the rented premises</u>.

(Emphasis added.)

The tenants did not pay the rent that was due on June 1, 2017. Maryland Property Management thereafter filed an eviction action in the District Court of Maryland for Baltimore City. Next, on August 8, 2017, Mrs. Hawkins filed a rent escrow action in the same court. She contended that there were serious health violations at the Property. A hearing was held on the rent escrow dispute in the district court on September 26, 2017.

5

By the time of that hearing, the appellees had not paid rent since June 2017. Nevertheless, the district court judge ruled that if the tenants would pay into escrow two month's rent, the eviction that was then set for October 4, 2017 would be cancelled. The tenants, however, did not pay anything into escrow and as a result, the eviction remained scheduled for October 4, 2017.

On the morning of October 4, 2017, Baltimore City Deputy Sheriff Trina Anderson went to the rental premises. Because of what she saw at the premises, she did not feel comfortable in going forward with the eviction, and, accordingly, she appeared in the district court that afternoon and reported to a judge why she had not gone forward with the eviction. Mrs. Hawkins and a representative of Maryland Property Management attended the hearing. At the conclusion of the hearing, the district court judge cancelled the eviction.

## II.

## EVIDENCE PRESENTED AT TRIAL

### A. <u>Testimony of Deputy Sheriff Trina Anderson</u>

Deputy Anderson went to the rental property on the morning of October 4, 2017, to evict the tenants. She explained that at an eviction, a representative of the landlord is usually present with his or her paperwork in hand. On the morning in question, she went to the front door of the Property and encountered a gentleman who she thought was acting suspiciously. That gentleman, it was later discovered, was Hassan Hamilton, who had been sent there by Maryland Property Management. According to Deputy Anderson, Mr. Hamilton was trying to get to the front door before her and was also trying to open a lockbox on the door before showing her the appropriate paperwork.

6

Mr. Hamilton told her that he was there to change the lock(s). While on the premises, Deputy Anderson saw trash bags in front of the house. She looked into one of the windows of the house and to her, it looked as though the premises had already been "cleaned out." More specifically, it appeared to her that a maintenance person had cleaned out the premises, not a tenant. Deputy Anderson also testified that her overall impression was that the tenants had been evicted already.

Although she could not recall exactly what she told the judge at the hearing on the afternoon of October 4, 2017, she believed that she told him that she didn't feel "comfortable proceeding with this eviction because it looked like [the tenants] weren't there, the house was empty, and I didn't understand why the guy was trying to change locks on an empty house[,] because if it's an empty house, why [are] you changing locks if they moved out?"

### B. Testimony of Helena Peters-Hawkins

Mrs. Hawkins testified that the reason she did not pay the June rent was because a close relative of hers had unexpectedly died and she had to help pay funeral expenses. She called Maryland Property Management to talk to one of their agents that worked in the office and to explain the problem. When she called, she spoke to a woman whose first name was Rosemary. Rosemary told her that it would be "okay" if she did not pay the rent for June so long as it was paid by the time that the lease came up for renewal in November 2017.

7

Despite what Rosemary had said, Maryland Property Management filed a failure to pay rent action against her and her husband seeking $1,550.00 for the rent due for June 2017.

In August 2017, Mrs. Hawkins filed a rent escrow action in which she complained about water leaks, mold and other serious deficiencies in the house she and her husband had rented. The rent escrow action was set for hearing in the Maryland District Court for Baltimore City on September 26, 2017.

Sometime in September 2017, on a Sunday evening, Ted Thornton (one of the appellants in this case), personally paid a visit to her home. The visit lasted approximately three hours. During that visit, Mrs. Hawkins showed Mr. Thornton the water leak, mold and other problems with the house. Mr. Thornton inquired of Mrs. Hawkins as to why he had not been notified of these problems prior to her filing a rent escrow action. Mrs. Hawkins replied that she <u>had</u> reported the problems to someone in the Maryland Property Management's rental office.

During the visit, Mr. Thornton looked around the house and said "I cannot believe this. Oh, I am so sorry that you [are] living in these type[s] of conditions." Toward the end of the three-hour meeting, Mr. Thornton expressed the view that Mrs. Hawkins shouldn't have filed the rent escrow case without having first talked to him. He then said, "well, if you drop the rent escrow case, any money [or] whatever that you owe it'll be gone. And we can start over." He then inquired: "Do you have that $1,500 on you like right now[?]" She replied in the negative, but Mr. Thornton reiterated that if she paid him $1,500

immediately then everything would "go away. You don't have [to go to] the court, why would you want to involve the courts."

Mrs. Hawkins turned down the offer and said that she would rather leave the situation the way it was. This caused Mr. Thornton to become very upset. He said, "I want you and your family the f*** out of my house, I want y'all out of here."

Mr. Thornton next said that when he got back to his office on Monday, he was going to talk to people there and was going to find out "what's going on." Mr. Thornton then said that he had "people watching" her and that if she "didn't give him the money . . . he was going to come in the house, he was going to remove my stuff, he was going to take my stuff, it's going to get ugly." Mr. Thornton added that he had lawyers and money, unlike her. He also expressed the view that she couldn't afford a lawyer and that she didn't know who she was dealing with.

The next day, after Mr. Thornton had a chance to go back to his office, he phoned Mrs. Hawkins and said "[y]ou're a f***ing liar. You lied. You never called my office. … [N]o one []ever spoke to you, I want you and your family the f*** out of here, and I want y'all out of here today." He then reiterated that she didn't know who she was "messing with." The phone call with Mr. Thornton scared Mrs. Hawkins. Because of these two encounters with Mr. Thornton, she called her son and her nephew and told them that she didn't want them to come to her house to "chill out" because she didn't know if Mr. Thornton was "going to pop up because he already told me that somebody [was] watching, he was going to come in and take my stuff . . . and I believed him."

9

On a date between September 26, 2017 and October 4, 2017, a man showed up at her doorstep, identified himself as "Mr. Williams," and said he was sent there by Mr. Thornton to fix "all the stuff that was wrong with the house." Mr. Williams also told her that he had been instructed by Mr. Thornton "to retrieve the key to the house from [her], because [she] was getting evicted anyway because he [Mr. Thornton] wanted [her] out of his house." She complied and gave a key to him.

Mrs. Hawkins knew that the eviction was to take place between 9 and 10 a.m. on October 4, 2017. Prior to that date, she had moved some, but not all, of her furniture and personal belongings out of the Property. She had made arrangements with her son, Douglas, and a family friend named Thomas Holland, to remove the remaining property on October 4, 2017. The two were instructed to go to the premises at 8 a.m. on October 4, 2017 and pick up all of the furniture and other belongings that she and her husband had left on the premises.

Mrs. Hawkins and her husband left the Property between 6 and 6:15 a.m. on the morning of October 4, 2017. She drove her husband to work and dropped her grandchildren off at someone else's house.

At approximately 8 a.m. that morning, she got a phone call from Thomas Holland who said that he was at the Property but could not get into the house because the door was locked. She said, in reply, that maybe the sheriff had already conducted the eviction and that there was nothing he could do about it.

10

Shortly thereafter, Mrs. Hawkins got a call from her son, Douglas, who was also at the Property. He notified her that a deputy sheriff was there and that he thought that she should immediately return to the Property.

Mrs. Hawkins returned to the Property, but when she did so, the deputy sheriff was not there, and she was told by Douglas to call the sheriff's office. When she did so, she was instructed to appear for a hearing in the district court at 1:00 o'clock that afternoon.

When she appeared in court, she heard Deputy Sheriff Anderson testify that the first floor of the house was empty. Mrs. Hawkins immediately inquired as to the whereabouts of her "stuff." The deputy sheriff could not answer that question.

The judge called off the eviction and told Mrs. Hawkins that she could go back to the house. Although previously Mrs. Hawkins had intended to take her family and move in, temporarily, with her mother, or possibly an aunt, or go to a hotel, she decided to go back to the Property. When she returned to the house on the afternoon of October 4, 2017, after the eviction had been called off, there was a lockbox on the door (that had not been there previously) and the door lock itself had been changed. Despite the fact that the lock had been changed, she was able to regain entry because her daughter climbed through one of the windows and opened the door from the inside. Thereafter, Mrs. Hawkins and her family lived at the Property for two more weeks. For that two-week period, the appellees had to climb through a window to gain ingress or egress from the house.

In her testimony, Mrs. Hawkins described the household furnishings and other items that were missing from the house that had been left behind for Mr. Holland and her son to retrieve. She also gave an estimate of the value of the property that was missing and described the emotional toll that she experienced as a result of the alleged lock out and the threats made to her by Mr. Thornton.

During her testimony, the following unobjected-to exchange occurred between Mrs. Hawkins and her counsel, *viz.*:

> Q. When you say you don't know who, do you have an idea about what happened to your property?
>
> A. Yes, I have a[n] idea.
>
> Q. And what's your idea about what happened to it?
>
> A. That Ted [Thornton] told the -- William and them to remove my stuff out of the house.
>
> Q. Okay. Did you tell all of your family about the lock out?
>
> A. Not all of them.
>
> Q. And why didn't you tell all of them?
>
> A. Because I'm embarrassed. I'm embarrassed because this man told me that he was going to do these things and he actually did it. He actually did it.

### C. Testimony of Ted Thornton – As an Adverse Witness

Mr. Thornton testified that ANT Properties, LLC was the owner of the Property. When Mr. Thornton was asked whether ANT was currently "in good standing," he replied: "[t]here's a partnership and the partner's wife did something a little screwy by cancelling the LLC, and she shouldn't have done that. And it created a big problem with the LLC

12

itself, and I have an attorney that's working on it." He also said he was not sure whether the "partnership" had been cancelled prior to when the appellees moved out of the Property. But when he was shown Plaintiff's Exhibit 9, he admitted that the "partnership" had been cancelled in 2015. Later in his testimony, on several occasions, Mr. Thornton said that <u>he</u> owned the subject property.

Mr. Thornton also testified that he was the managing member of Maryland Property Management, LLC. That LLC manages "hundreds of properties."

On a Sunday evening in September 2017, Mr. Thornton went to the Hawkinses' home because he had been notified by a health inspector that there was water damage and mold problems at the house.

Mr. Thornton further testified that Maryland Property Management retained an independent contractor named William Gaskins to perform the necessary repairs to fix the water damage and mold problems at the Property.

The lockbox that was on the leased premises was put there by the leasing agent prior to the time the appellees rented the house. In Mr. Thornton's words, the lockbox was "always on the door." Nevertheless, during his direct testimony, he admitted that he signed an interrogatory answer, on behalf of Maryland Property Management, that said, in pertinent part: "No one changed the locks on October 4th, 2017. A key to the residence was in the lock[]box and accessible to Plaintiffs. The lock[]box was placed on the door for workmen to enter the residence."

## D. **Testimony of Thomas Holland**

Mr. Holland testified that on the morning of October 4, 2017, he arrived at the Property between 8 and 8:30 a.m. He had a key to the premises that had been given to him by Mrs. Hawkins, but the key would not work. Because the key would not allow him to enter the Property, he called Mrs. Hawkins's son, Douglas, who was on his way to the premises. Just as he was doing that, he saw a deputy sheriff and a gentleman at the front door to the house. He overheard the deputy sheriff saying that the lockbox should not be on the door.

## E. **Testimony of Charles Hawkins**

Mr. Hawkins testified that on the morning of October 4, his wife drove him to work. When he left for work that morning, there were numerous articles of personal property still in the house. While at work that morning, his wife called and told him to return to the Property. After work, he returned and found that the house was empty except for one mattress.

## F. **Testimony of William Gaskins – as a Defense Witness**

Mr. Gaskins testified that he was an independent contractor employed, from time-to-time, by Maryland Property Management. Prior to October 4, 2017, he had been to the Property approximately eight times to repair mold, water damage and other problems.

He testified that when he visited the Property, he had seen a lockbox, but he never thought that there was anything in it, nor did he ever put a key in the lockbox.

He emphatically denied that he had ever asked Mrs. Hawkins for her key, nor did she ever give him her key.

14

On October 5, 2017, he went to the Property, having been advised that the tenants had moved out the previous day. But when he arrived, he found that someone was living in the house. For that reason, he did not change the locks on the door as he had intended to do.

### G. Testimony of Ted Thornton – as a Defense Witness

Mr. Thornton said on direct examination that he was the "managing member" of both Maryland Property Management, LLC and ANT Properties, LLC. He also said that ANT owned the Property and that Maryland Property Management managed it. He added, somewhat confusingly, that the premises that the appellees rented was "my house."

In regard to his meeting with Mrs. Hawkins in September 2017, he remembered visiting her house and telling her that she could stay at the premises if she could come up with $1,600.00. He denied that he ever directed anyone to change the lock on the house prior to the eviction. On the date of the scheduled eviction, October 4, 2017, he sent Hassan Hamilton to go to the Property and to change the locks after the sheriff had approved the paperwork and had gone through the house. He denied that anybody changed the lock prior to the deputy's arrival on October 4, 2017. He also denied ever confiscating Mrs. Hawkins's key or asking anybody else to confiscate it. He emphatically denied ever threatening to have someone come into the house and take Mrs. Hawkins's belongings.

According to Mr. Thornton's testimony, the lockbox was on the house when the appellees moved in. He testified, however, on cross-examination, that he was not 100% sure that the lockbox was on the door when the lease with the appellees began.

Other facts will be added, as needed, to answer the questions presented.

15

### III.

### ANALYSIS

### A. **Question One**

At the conclusion of the appellees' case in chief, defense counsel made a motion for judgment as to ANT only. The following exchange occurred:

> [Counsel for Appellants]: I don't know that there's been any evidence of any separate action by ANT Properties for the two counts. The only evidence has been that their theory is it's Theodore Thornton and because he's a member of both LLCs, that both are liable, but the only evidence is that there's a lease with Maryland Property Management. So[,] I don't know how they include ANT Properties just because they're the owner of the property.
>
> There [h]as been no evidence that he had properties, did anything relating - -
>
> THE COURT: Didn't - -
>
> [Counsel for Appellants]: - - to the two counts.
>
> THE COURT: Didn't Mr. Thornton say that ANT Properties owned the house - -
>
> [Counsel for Appellants]: He did say that - -
>
> THE COURT: - - too?
>
> [Counsel for Appellants]: - - they're the owner, but they haven't done anything related to the two counts.
>
> THE COURT: Anything else?
>
> [Counsel for Appellants]: No.
>
> THE COURT: All right. That's denied.

After the motion for judgment was denied, the appellants proceeded to introduce evidence.

16

When the appellants rested their case, the following colloquy occurred at the bench:

> THE COURT:  Okay.  Sorry. Rebuttal witnesses?

> [Counsel for Appellees]: No, Your Honor.

> THE COURT:  All right.  So we need to talk about jury instructions. And then we're going to have a lunch break.  And then I have a bench meeting.  So we're probably not going to resume until 2 o'clock at which time I'll instruct them and let them deliberate.

> Anything else from them?

> THE CLERK:  Oh, no.

> THE COURT:  Oh, okay.  So let me –

> [Counsel for Appellants]:  And I'll renew my motion.

> THE COURT:  Okay.  Let me release them.

> (Whereupon, counsel returned to trial tables and the following occurred in open court:)

> THE COURT:  All right. Members of the jury, at this time, we are going to take a break and we have some instructional issues to go over.  And then I have a bench meeting.  So we're not going to resume until 2 o'clock.

> But when we do resume, I will then instruct you as to the law and you will be sent to deliberations today.  So you do have kind of a long lunch. Please make sure that you're back here and in the jury room before 2 o'clock.

> Thank you.

> And I'm going to just take a brief recess and I'll come back.

(Emphasis added.)

After a short recess, the trial judge and counsel proceeded to have an on-the-record discussion of jury instructions.  During that discussion, nothing was said about the motion for judgment and when the jury returned, no mention was made in regard to that subject. The trial judge next proceeded to instruct the jury.

17

The first argument presented by appellants in this appeal is worded as follows:

The trial court erred in denying the Rule 2-519 motion of appellant ANT Properties, LLC, at the close of plaintiffs' case in chief, when plaintiffs presented no evidence that ANT was the landlord[.]

Maryland Rule 2-519 reads, in pertinent part, as follows:

**Motion for judgment.**

(a) **Generally.** A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.

(b) **Disposition.** When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

(c) **Effect of denial.** A party who moves for judgment at the close of the evidence offered by an opposing party may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. In so doing, the party withdraws the motion.

(Emphasis added.)

As appellees point out in their brief, Issue I has not been preserved for review because, as stated in Md. Rule 2-519(c), when a party introduces evidence after a motion for judgment has been denied at the conclusion of the opponent's case, that motion is withdrawn. In fact, later in appellants' brief, when discussing Issue II, appellants explicitly

18

admit that "a Motion for judgment, made at the close of the opponent's case and thereafter denied, is withdrawn when the party making the Motion offers evidence in its own case-in-chief."

For the above reasons, we hold that the first issue presented has not been preserved for appellate review.

## IV.

## ISSUE II

Appellants next argue that the trial court erred in denying their motion for a new trial and ANT's motion for judgment notwithstanding the verdict ("JNOV"). The grounds for ANT's motion for JNOV was that appellees had produced no law or evidence to support a holding that ANT had been the "landlord" as that term is used in RP § 8-216.

ANT points out, correctly, citing *Nelson v. Carroll*, 350 Md. 247, 254 (1998), that if, at the end of all the evidence, the movant states that the motion is based upon the same reasons given at the time the original motion for judgment was made, or renews a motion for judgment, the party implicitly incorporates by reference the reasons previously given. The problem in this case, however, is twofold. First, on this record, it is unclear as to whether counsel for ANT did, in fact, "renew" his motion for judgment. The trial judge, in her memorandum and order denying ANT's motion for a JNOV said:

> In the case under review, this [c]ourt, having reviewed its notes and the video recording of the trial, finds that [d]efendants did not move for judgment on December 13, 2018, at the close of the evidence. During a bench conference following [d]efendants' case, defense counsel said he would like to renew his motion, but was then directed to wait so the [c]ourt could take a recess. Upon reconvening, defense counsel did not move for judgment or make any further argument in support of a motion for judgment.

19

> Contrary to [d]efendants' contention in their Reply, [d]efendants had ample opportunity to make a motion or to assert arguments in support of judgment in their favor. Principles of preservation require that a movant elicit a ruling on a motion prior to the conclusion of a trial.
>
> The [c]ourt finds that defense counsel's remark during the bench conference was insufficient to satisfy the requirement that a party move for judgment, with particularity, at the close of the evidence. Thus, [d]efendants' Motion for JNOV must be denied on procedural grounds.

(References to transcript omitted.)

The issue addressed by the trial judge in her memorandum boils down to whether, in the context of the bench conference, defense counsel's statement that "I'll renew my motion for judgment" meant that he was renewing his motion for judgment or whether it meant, as the trial judge believed, that he would renew his motion for judgment at the end of the court recess. Weighing the scales in favor of the trial judge's interpretation is the fact that the court never ruled on appellants' (assumed) renewal of the motion for judgment. If there had been such a renewal, one would expect defense counsel to ask for a ruling, which he never did.

A motion for JNOV is, in essence, a motion asking the trial court to reconsider the denial of a motion for judgment made at the conclusion of the entire case. As we said in *Nu Car Carriers, Inc. v. Everett*, 33 Md. App. 310, 312-13 (1976): a motion for JNOV "may be made only to bring up for reconsideration, a motion for directed verdict (now motion for judgment), made at the close of all of the evidence, and <u>at that time either denied or reserved by the trial court</u>." (emphasis added). Here, it is undisputed that at the conclusion of the evidentiary phase of the case, the trial judge did not deny appellants' motion for judgment.

20

In regard to the motion for JNOV, a second preservation problem is presented. Md. Rule 2-532(a) provides that a motion for JNOV may be made "only on the grounds advanced in support of the [motion for judgment]." As the Court of Appeals said in *Sage Title Group, LLC v. Roman*, 455 Md. 188, 216 (2017): "Sage Title waived its unclean hands/*in pari delicto* argument because it failed to articulate this ground in its motion for judgment and could not 'renew' the argument for purposes of its JNOV motion." *Id*. at 216.

In this case, the first time that counsel for ANT argued that ANT could not be held liable for violation of RP § 8-216(b) because there was no proof that ANT was the "landlord" (as that term was used in the statute), was in ANT's post-trial motion for JNOV. At the conclusion of the plaintiffs' case, counsel only argued, in a very general fashion, that ANT hadn't "done anything related to the two counts." Md. Rule 2-519(a) provides that a party making a motion for judgment "shall state with particularity all reasons why the motion should be granted." The reason for the particularity requirement is "to ensure that the opposing party is not 'sandbagged.'" *Fearnow v. Chesapeake & Potomac Telephone*, 104 Md. App. 1, 27 (1995) (quoting *Annapolis Mall Ltd. Partnership v. Yogurt Tree, Inc*., 299 Md. 244, 256 (1984)).

For the above reasons, we agree with the trial judge that ANT did not preserve, for post-trial review by the circuit court, the issue of whether appellees had proved that ANT was a landlord, within the meaning of RP § 8-216(b).

But even if the issue had been preserved, we conclude that the appellees did present sufficient proof that ANT was the landlord. ANT disagrees and argues as follows:

21

It is a matter of judicial notice that owners of property retain third party entities for the purpose of managing the property and relationships with Tenants or with anyone else. As ANT argued in its Motion [for JNOV], the jury determination would require a finding that there were three Landlords.[2] ANT finds no authority for the proposition that the General Assembly has intended to hold that all owners of property, even when not named on the lease or not involved in management, are, inherently, Landlords.

Where a statute is ambiguous, the [c]ourt also considers the consequences resulting from one meaning rather than another and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with the common sense. *Smith v. State*, 425 Md. 292, 300 (2012). Here, in the absence of a Real Property definition of Landlord that provides that all owners are Landlords, the lower [c]ourt should have declined to have adopted that construction of RP § 8-216.

The trial [c]ourt should have granted ANT's Motions. ANT asks this Court to reverse the judgment against ANT, under the RP § 8-216 claim.

At another point in its brief, ANT stresses that the name of ANT does not appear in the lease and that the lease was with "Maryland Property Management."

As mentioned earlier (see page 5, *supra*), the first paragraph in the lease identifies Maryland Property Management as the "property manager for owner (landlord)." And, paragraph 9 states that Maryland Property Management is the agent for the landlord, and as such, "has full authority from the owner to manage the rented premises." In other words, the appellees proved that in the lease itself, the words "landlord" and "owner" were used synonymously. And, at trial, through the testimony of Mr. Thornton, the owner of the Property was identified as ANT.

---

[2] We disagree with the "three landlords" argument. The jury could reasonably have determined that ANT was the landlord, and that Ted Thornton, at all times here relevant, was acting as an agent of ANT and Maryland Property Management.

The goal in statutory interpretation is to divine the intent of the Legislature. *See Kortobi v. Kass*, 410 Md. 168, 176-77 (2009). In this endeavor, we turn initially (and often only) to the plain language of the statute; if the Legislature resolved the present dispute through the plain words of the statute, we are not obliged to consult other sources of legislative history. *See Price v. State*, 378 Md. 378, 387 (2003) ("[A]ll statutory interpretation begins, and usually ends, with the statutory text itself . . ., for the legislative intent of a statute primarily reveals itself through the statute's very words . . . ." (citations omitted)) .

*Guttman v. Wells Fargo Bank*, 421 Md. 227, 234 (2011).

Statutory construction:

"begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Bowen v. City of Annapolis*, 402 Md. 587, 613 (2007) (quoting *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576 (2005)).

*Kortobi v. Kass*, 410 Md. 168, 177 (2009). *See also, Baltimore City Detention Center v.*

*Foy*, 461 Md. 627, 645 (2018) (When interpreting a statute "we may consult a dictionary

and give words their ordinary meaning.").

Merriam-Webster's Dictionary (2019) defines the **word** "landlord" as:

1. the owner of property (such as land, houses, or apartments) that is leased or rented to another.

https://www.merriamwebster.com/dictionary/landlord.

*Black's Law Dictionary* (11ᵗʰ ed. 2019) defines "landlord" in the following manner:

**landlord** (bef. 12c) 1. At common law, the feudal lord who retained the fee of the land. – Sometimes shortened to lord. 2. Someone who rents a room, building, or piece of land to someone else.

Significantly, ANT, in its brief, does not propose any definition of the word

"landlord" that it contends the court should have used in determining whether to grant its

23

motion for JNOV.  And, in any event, it is clear the word landlord, as used in the statute, means owner of the property that is leased.

It is true, as ANT argues, that a statute should not be construed to have a meaning that would produce an illogical or unreasonable result or one that is inconsistent with common sense.  But we fail to see how such a result would occur if the statute were read to treat the word "landlord" and "owner" as synonymous.

ANT also argues for the first time on appeal, that because ANT was not called a "landlord" in appellees' complaint, the jury should not have been allowed to find that ANT was appellees' landlord.[3]  We reject that contention.  Even if we assume that ANT renewed its motion for judgment at the conclusion of the evidentiary phase of the trial, ANT never raised this pleading error as a ground for that motion.  Due to the particularity requirement set forth in Md. Rule 2-519, such a belated contention could not be successfully raised as a ground for the grant of a JNOV.

Appellant also argues:

> Jury inferences must be sound logically, and Maryland Courts will refuse to allow a jury of laymen to engage in guesswork, speculation and conjecture.  *Hamilton v. Kirson*, 439 Md. 501 (2014).  ANT submits that it was impermissible to allow a jury to find that ANT was a Landlord, when such had not been . . . proven at trial.  Moreover, as stated above, the lower [c]ourt's authority upon a Motion for a new trial is broad enough that it may prevent miscarriages of justice.

---

[3] The plaintiffs did allege in their complaint that appellant was the owner of the premises and that it had violated RP § 8-216.

Here, there was no "miscarriage of justice." The appellees proved that ANT owned the leased premises and, using the common meaning of the word "landlord," the jury could have rationally found that the meaning of the words "landlord" and "owner," as used in the statute, were the same.

For the reasons stated above, we hold that the trial judge did not err when she denied ANT's motion for JNOV.

**V.**

**ISSUE III**

Appellants argue:

> The trial court erred in refusing to grant appellants' motion for a new trial with respect to any liability under RP § 8-216, as there was no evidence from which a jury could have inferred the necessary elements of that cause of action, the Hawkins family having remained living at the house for two weeks after the cancellation of the eviction.

At the conclusion of the trial, neither Maryland Property Management nor Mr. Thornton made a motion for judgment and ANT's motion for judgment was not based on the grounds it now raises. Nevertheless, an appellant can raise the issue of insufficiency of the evidence for the first time in a motion for new trial. *See Cam's Broadloom Rugs, Inc. v. Buck*, 87 Md. App. 561, 575-76 (1991) ("the trial court may grant a new trial for any reason that will support its determination that a party was denied a fair trial, and there is nothing in Md. Rule 2-533 which precludes a judge from granting a new trial on the basis of an issue that could have been, but was not, raised during trial.").

> Whatever the ground for a motion for new trial, the standard for granting the motion differs from the one employed in granting a motion for judgment under Rule 2-519 or a motion for judgment notwithstanding the

25

verdict under Rule 2-532. The requirement for granting those motions is the absence of substantial evidence to support a verdict. <u>Determination of whether to grant a motion under this rule is made on the judge's consideration of "the core question of whether justice has been done."</u> *Butkiewicz v. State*, 127 Md. App. 412, 422, *cert. denied*, 356 Md. 495 (1999).

Maryland Rules Commentary, Rule 2-533 page 740 (5th ed. LexisNexis Matthew Bender)

(emphasis added).

A trial judge has very broad discretion to grant or deny a motion for new trial. As we said in *Steinhoff v. Sommerfelt*, 144 Md. App. 463, 484 (2002):

> The trial judge has boundless discretion not to indulge this all-too-natural desire to raise issues after the fact that could have been raised earlier but were not or to make objections after the fact that could have been earlier but were not. Losers do not enjoy *carte blanche*, through post-trial motions, to replay the game as a matter of right.
>
> Even assuming, *arguendo*, the appealability of the denial of a post-trial motion, the appellant would carry a far heavier appellate burden on that issue than he would carry in challenging the denial of a more timely motion for relief made during the course of trial.
>
> * * *
>
> That a party, *arguendo*, should have prevailed on the merits at trial by no means implies that he should similarly prevail on a post-trial motion to reconsider the merits.

Here, the trial judge, in her post-trial memorandum, thoroughly reviewed the evidence. After such a review, the trial judge's discretion as to whether to grant, or deny, a new trial is "at its broadest." *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 59 (1992):

Appellants argue:

> The argument of Mr. Thornton, [Maryland Property Management], and ANT, as to liability under the lock[ ]out statute, is found at pages 5-7 of

26

their Motion [for New Trial]. Appellants argued that liability could have been asserted only if Mr. and M[r]s. Hawkins had been locked out. Further, that the jury must have been confused as to the difference between a lockbox and a lock[ ]out; that Mr. and M[r]s. Hawkins had never been locked out; that upon the cancellation of the eviction, within the district [c]ourt hearing, M[r]s. Hawkins called Mr. Hawkins to come back to the house for the night; and that the Hawkins family continued to occupy the house later than the evening of October 4-5.

\* \* \*

[F]ocusing on the verbiage of subsection (b)(1) [for RP § 8-216], it is prefaced, "[e]xcept as provided in paragraph (2)." Underlining added. Appellants submit that the [c]ourt should have first directed [its] attention upon that paragraph (2). And, the first requirement of paragraph (2) would have been whether the Landlord (whichever of the Appellants that might have been) had taken possession of the dwelling unit from Mr. and M[r]s. Hawkins.

None of the evidence suggested that [Maryland Property Management] or any other Appellant had taken possession. One can argue over whether a jury was entitled to find that the locks had been changed in the short time between the time M[r]s. Hawkins left the house at 6:15 a.m. on the morning of October 4, 2017; and the arrival of the sheriff at 9:00 or 9:23 a.m. Implausible as that may have been, and in the absence of anyone testifying as to such conduct within a two or two and a half-hour window, even if the jury was entitled to so infer, the question is whether any Appellant took possession.

The trial judge, in her written opinion, found that the appellees had presented sufficient evidence to prove that they had been "locked out" within the meaning of RP § 8-216(b). The court's opinion, however, did not discuss whether there was evidence that appellants had taken possession of the premises. The apparent reason that this was not discussed was that in appellants' written motion for a new trial, appellants did not argue that the appellees had failed to prove that appellants had taken possession of the premises. Md. Rule 2-533(b) provides that: "[a]ll grounds advanced in support of the motion shall be

27

filed in writing within the time prescribed for the filing of the motion, and no other grounds shall thereafter be assigned without leave of court." Here, appellants did not either ask for, or obtain, leave of court to list any additional grounds. Therefore, the argument that appellees failed to prove that appellants took possession of their Property appears to have been waived. But we will, nevertheless assume, *arguendo*, that it was not waived. As discussed, *infra*, there was sufficient evidence that defendants, and/or their agent, changed the lock on the front door of the Property, before the appellees were evicted. Changing the locks deprived appellees of possession of the premises, albeit only briefly (until a family member could gain entry by climbing through a window). There was also evidence from which the jury could rationally infer that agents of appellants had entered the Property and removed property of the appellees that was worth more than $2,000.00. The jury could also have found that such an unauthorized entry deprived the appellees of their right to sole possession of the rental premises.

Appellants, both in this appeal and in the trial court, also contend that there was insufficient evidence presented to prove that appellees were locked out of the premises <u>by appellants</u>. Proof that the lock on the front door to the leased premises had been changed prior to the eviction, by appellants or their agent(s), would constitute a "lock out" under the statute. As mentioned, Mr. Holland testified that Mrs. Hawkins gave him a key to the front door of the premises. He arrived at the house between 8 and 8:30 a.m. on the morning of October 4, 2017 and the key to the front door would not open that door. From that testimony, the jury could infer that sometime between 6:15 and 8:30 a.m. someone had changed the lock. That inference was bolstered by Mrs. Hawkins's testimony that when

she returned to the rental premises, after the court hearing on October 4, 2017, she found that the lock on the front door <u>had</u> <u>been</u> <u>changed</u>; she also found that afternoon that someone had installed a new lockbox that had not been there previously. That lockbox was also observed by Deputy Anderson when she arrived at the premises between 9 and 9:30 a.m.

There was no direct evidence as to who changed the lock to the front door or who installed the lockbox, but the jury could infer, legitimately, that it was either Ted Thornton, acting on behalf of the two companies he controlled (ANT and Maryland Property Management), or someone directed by Mr. Thornton to do the work. That would be a rational inference for at least two reasons. First, no one else would have had the incentive to install a new lockbox and to change the lock other than appellants or persons acting as their agent. Second, according to Mrs. Hawkins's testimony, Mr. Thornton had threatened to take drastic action against her when he said to her prior to the date scheduled for eviction: "I want you and your family the f∗∗∗ out of my house, I want y'all out of here." He had also said that if she didn't give him the rent money immediately, "he was going to come in the house, he was going to remove [her] stuff, . . . it's going to get ugly." Also, supporting the inference that Mr. Thornton, or someone acting at his direction, had changed the lock was the fact, according to Mrs. Hawkins's testimony, that Mr. Thornton fulfilled his threat inasmuch as the proof showed: 1) that as of 6:15 a.m. on October 4, 2017, there were numerous items of personal property belonging to the appellees that were still on the premises but, when Deputy Anderson arrived at the premises, the house looked empty; and 2) furthermore, when Mrs. Hawkins returned to the premises on the afternoon of October

29

4, she found that articles of personal property worth over $2,000.00 that had been left on the premises, were no longer there. Accordingly, if the witnesses called by appellees were believed, it was more probable than not that the appellees were locked out and deprived of their personal property by appellants. What we said in *Bell v. Heitkamp, Inc.*, 126 Md. App. 211, 224-25 (1999) concerning the legitimacy of an inference, is here apposite:

> The "more probable than not" rule is implemented by the use of inferences. The test for the legitimacy of an inference was explained by the late Judge Charles Orth in [*Chesapeake & Potomac Telephone*] *Co. v. Hicks*, 25 Md. App. 503 (1975), as follows:
>
>> The test for the legitimacy of an inference is often expressed in this way: "where from the facts most favorable to the plaintiff the nonexistence of the fact to be inferred is just as probable as its existence (or more probable than its existence), the conclusion that it exists is a matter of speculation, surmise, and conjecture, and a jury will not be permitted to draw it." *Id*. This test is directed to the court's function and not to the jury's. "The court must determine whether the existence of fact A (which has been testified to) is more probable than not, *as a generalization*, attended by the coexistence of fact B. If the court makes the initial determination in favor of the legitimacy of the inference, the issue goes to the jury to determine whether[,] upon the preponderance of the evidence *in this case*[,] they find[:] (a) that fact A probably *did exist* and, if so, whether fact B probably *did exist* (again, in this case)." [2 F. Harper & F. James, *The Law of Torts* § 19.4], pp. 1068-1069. This view was adopted by the Court of Appeals in *Short v. Wells*, 249 Md. 491, 495-496 (1968).
>
> *Id*. at 524-25 (footnote omitted).

For the above reasons, we agree with the trial judge that there was sufficient evidence for the jury to find that the appellants locked out the appellees and took their property.

As mentioned, appellants also argued that "the jury must have been confused as to the difference between a lockbox and a lock out[.]" We reject that contention, as did the

30

trial judge. There was a video tape introduced showing the lockbox. Also, there was extensive testimony concerning when the lockbox was installed. There was no reason that the jury would have confused a lock out with a lockbox.

The trial judge also found that there was sufficient evidence from which the jury could find that Mr. Thornton had "threaten[ed] to take possession of a dwelling" as prohibited by RP § 8-216(b). That finding was supported by the statutory definition of the phrase "threaten to take possession" as meaning "using words . . . intended to convince a reasonable person that the landlord intends to take imminent possession of the property in violation of this section." Real Property § 8-216(a)(2). If Mrs. Hawkins's testimony was believed, Mr. Thornton, in September 2017, which was prior to the date that the landlord was legally entitled to take possession, threatened Mrs. Hawkins by saying that he was going to come into the house and take property belonging to the appellees and also saying he wanted her and her family out of the house "today." Such an invasion and confiscation of property could reasonably be interpreted by a juror as a threat to take immediate possession of the property.

In arguing that the appellees did not present sufficient evidence to allow the jury to consider whether RP § 8-216 had been violated, appellants stress the fact that Mrs. Hawkins testified at the court proceeding held on the afternoon of October 4, 2017, that she did not want to live at the house anymore and that on the morning of October 4, 2017, both Mr. and Mrs. Hawkins had intended to vacate the property. All of this is true. But after the judge cancelled the eviction, Mrs. Hawkins changed her mind and decided to stay. The appellants had no right to change the lock prior to the point that appellees were legally

31

evicted. Moreover, what Mrs. Hawkins and her husband intended to do on the morning of October 4, 2017, would not excuse the prior conduct of Mr. Thornton when he threatened to invade the rental premises and confiscate their property.

For all of the above reasons, we hold that the trial judge did not err in denying the motion for new trial.

## VI.

## ISSUE IV

When the appellants filed their motion for a new trial, they pointed out, accurately, that the jury verdicts were, in part, inconsistent. As mentioned earlier, the jury awarded $3,000.00 in economic damages to the appellees for a violation of RP § 8-216. The only evidence as to any economic damages as a result of the violation of that statute was the value of the personal property that was taken from the premises by agents of the appellants. Mrs. Hawkins testified as to the value of that property and the total value, according to appellees' trial counsel, came to a total of $2,027.98. The jury was instructed that they could add an amount for interest at the "legal rate" for the loss of the property. On the verdict sheet, when the jurors came to the issue of what damages were caused by the conversion of the property belonging to the Hawkinses, the jury awarded $10,000.00. Because the conversion damages that were proven (which were all economic damages) were exactly the same as the economic damages that were proven by appellees to have been suffered by them due to the statutory violation, the two verdicts were irreconcilably inconsistent. In their motion for new trial, the appellants asked the court to take "corrective action" in regard to this inconsistency or, in the alternative, for a new trial.

32

In *Montgomery Ward & Co., Inc. v. Cliser*, 267 Md. 406, 424 (1972), the issue presented to the circuit court was whether the jury could make three separate awards of punitive damages "for the same wilful, wanton and malicious conduct." The Court answered that question in the negative, saying:

> For reasons not relevant here, we were not required to reach the question [triple recovery for the same wrong] which confronts us in this case. In our view, this point is controlled by the following principles quoted in 25 C.J.S. *Damages*, § 3:
>
>> "It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories . . . . The overlapping of damages is generally not permissible, and a person is not entitled to recover twice for the same elements of damage growing out of the same occurrence or event . . . ."
>
> We think that in view of the combination of events presented in this case, the trial court erred in not furnishing guidelines to the jury in its consideration of whether to award punitive damages for each of the three torts. The result, as we see it, was that the jury "pyramided" the claims into a triple recovery of punitive damages on the basis "of an episode that was one continuous occurrence."
>
> Because <u>we deal here with error uniquely convertible into monetary terms, we need only make an adjustment, without further proceedings below,</u> which will correctly reflect the verdict of the jury. To that end, we shall modify the judgment so that there may be but one recovery of punitive damages.

*Id*. at 425 (emphasis added).

In opposition to the appellants' request to modify the verdict, appellees argued that Mrs. Hawkins testified as to the value of lost property and that plaintiffs were entitled to "additional damages," as explained in the jury instructions regarding conversion because

the appellees were still paying for some of the converted items that they had purchased on credit.[4]

The court instructed the jury as follows:

> The measure of damages for conversion of personal property is the market value at the time and place of the interference plus the legal rate of interest to the date of judgment. Additional damages may be awarded in conversion to the extent necessary to compensate the plaintiff for the actual losses sustained.

In the trial judge's written opinion, the court ruled that appellants had waived the issue of inconsistent verdicts. The court also said:

> [E]ven in the absence of a waiver of this argument, [d]efendants' contention is baseless. It was well within the province of the jury to determine the amount of damages to which [p]laintiffs are entitled. The jury was presented with evidence from which, in an exercise of its discretion, it was permitted to award appropriate damages to [p]laintiffs. *Adams v. Owens-Illinois, Inc.*, 119 Md. App. 395, 408-09 (1998) (quoting *Owens-Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 521 (1996). Notably, the jury award was less [than] the amount that [p]laintiffs requested. The jury's award of damages will not be changed.

The damages that appellees asked for in their complaint is irrelevant. The relevant inquiry is what damages, if any, were proven. And, it is undisputed that the economic damages for the statutory violation were the same as the conversion damages. In other words, there is no valid reason that the jury could have legitimately found $3,000.00 in economic damages as to Count I and $10,000.00 damages on the conversion count.

---

[4] The court did instruct the jury that it could award additional damages on the conversion count but only "to the extent necessary to compensate the plaintiff for the actual losses sustained." Mrs. Hawkins testified that she was "still paying for" one item: a $600.00 "living room set" that was taken. She didn't say how much interest, if any, she was paying but under the jury instruction, she was only entitled to recover the legal rate of interest. There were no other "actual losses sustained."

Counsel for appellees, in her closing argument, conceded that the damages for conversion were the same as the economic damages for the statutory violation. In regard to the damages for the statutory violation, counsel for the appellees stated:

> If you answered yes to any of the above, what damages do you find for x amount of damages? That means totaling the cost for the stuff that they lost as a result of being locked out. You heard testimony that the bunkbeds were $250, toddler beds were $59 and $79, the dishes were $19.99 and there were two sets of those. Clothes were $400 and $500. The sheets and blankets were $400. And the CD was $679.[5] You add that all up, it comes to $2,027.98. So that's what we're suggesting that you put there.

Shortly thereafter, in arguing what the damages should be as to the conversion count, counsel for appellees argued:

> The second count has to do with the loss of their things. So conversion means that they lose – that someone else takes possession of their things and that they lose possession of those things. So we are asking that you check yes as to Maryland Property Management, LLC, yes as to ANT Properties, LLC, and yes as to Mr. Thornton.
>
> And then here, the damages, that would be the same amount for the economic damages which is $2,027.98 because that's how much M[r]s. Hawkins testified to the amount of – that she paid for those items.

Counsel for the appellees did not include in her calculation the value of a living room set that was taken, which Mrs. Hawkins said cost $600.00 and that she was "still paying for" it.[6]

---

[5] Counsel apparently intended to say "TV" rather than "CD."

[6] The total value of the property taken was $2,027.98 plus $600.00 or $2,627.98. The pre-judgment rate of interest was 6% per year. The cost of goods taken ($2,627.98) plus pre-judgment interest ($187.78) equals $2,815.78, which is fairly close to the $3,000 awarded for economic damages.

Appellants' argument that the verdicts were inconsistent was by no means baseless. There was no evidence of damages for loss of use. Under the jury instructions, the jury could have, and apparently did, allow some extra money in arriving at their $3,000.00 verdict for prejudgment interest. But having awarded economic damages of $3,000.00 for the statutory violation, the jury reached an irreconcilably inconsistent verdict when it awarded $10,000.00 for the same damages under the conversion count.

We also disagree with the trial judge's conclusion that the appellees waived their argument as to inconsistent verdicts. In support of that waiver conclusion, the trial judge cited, *inter alia*, *Givens v. State*, 449 Md. 433 (2016), which held that in a criminal case, to preserve an issue of legally inconsistent jury verdicts, a defendant must object before the jury is discharged. *Id*. at 472-73. But the rule is different in a civil case as explained in *Southern Management Corp. v. Taha*, 378 Md. 461, 492 (2003). In *Taha*, Southern Management and two of its employees, were sued for malicious prosecution. *Id*. at 467. The theory of the plaintiff, Mr. Taha, was that his former employer, Southern Management Corporation, was liable for damages incurred as a result of a malicious prosecution action brought against him by two of Southern Management's employees. *Id*. The jury returned a verdict in favor of the two employees but found against Southern Management Corporation. *Id*. Counsel for Southern Management Corporation did not object to the jury instructions nor was any objection made to the inconsistent verdicts at trial. *Id.* at 475. In *Taha*, as here, the first objection to the inconsistent verdict was in a post-trial motion. *Id*. Nevertheless, the Court of Appeals held that such an inconsistent verdict could not be allowed to stand. The pertinent language in *Taha* was:

[T]here remains a distinction between inconsistent verdicts in criminal cases and *irreconcilably inconsistent jury verdicts* in civil matters. While a member of the Court of Special Appeals, Chief Judge Bell considered the effect of irreconcilably inconsistent verdicts in a civil fraud case, holding that they cannot stand:

> It is well settled that irreconcilably defective verdicts cannot stand. *Gaither v. Wilmer*, 71 Md. 361, 364 (1889). Where the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict in favor of the defendant, the verdict is irreconcilably defective. *Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir. 1985); *Carter v. Rogers*, 805 F.2d 1153, 1158-59 (4th Cir. 1986); *Robertson Oil Co., Inc. v. Phillips Petroleum Company*, 871 F.2d 1368, 1373 (8th Cir. 1989); *Hopkins v. Coen*, 431 F.2d 1055, 1059 (6th Cir. 1970); *Lewis v. Yaggi*, 584 S.W.2d 487, 497-98; *Russell v. Pryor*, 264 Ark. 45, 568 S.W.2d 918, 922-23 (1978).

*S & R, Inc. v. Nails*, 85 Md. App. 570, 590 (1991), *rev'd on other grounds*, 334 Md. 398 (1994) (involving an irreconcilably inconsistent verdict awarding punitive damages on a fraud claim where the jury had determined that the defendant had acted only with implied rather than actual malice). The verdict rendered by the jury in the case *sub judice* is irreconcilably inconsistent and, therefore, cannot be permitted to stand.

378 Md. at 488 (footnote omitted).

The trial court's reliance on *Givens*, a criminal case, was misplaced. The trial court, in support of its waiver holding, also relied on a 2018 unreported decision by a panel of this Court, *Mack Trucks, Inc. v. Coates*, No. 2709, Sept. Term 2016 (Md. App. May 11, 2018), that held that in a civil case, failure to object to an irreconcilably inconsistent verdict prior to the discharge of the jury, waived the objection. The panel cited *Givens* for that proposition and, in a footnote, attempted to distinguish *Taha* on the grounds that in the *Taha* case, the Court had observed that it was "procedurally fair" to correct the verdict post-trial because the appellants had only asked to correct the verdict and not for a new

37

trial. *Id.* at 19 n.10. In the view of the panel in *Coates*, the defendants' belated objection in *Taha* did not materially impair judicial efficiency because the relief sought did not require a new trial, but in *Coates*, a new trial was the only remedy available to correct the problem. Although the matter need not be decided, because here the appellants did ask, in the alternative, that the inconsistency be corrected, it is doubtful that the *Taha* majority wanted to allow post-judgment corrections of irreconcilably inconsistent verdicts to be available only when a new trial would not be necessary.

> The Court said in *Taha*:

> Based on the circumstances in this case, it is "procedurally fair" to address the merits of SMC's contentions, especially given the absence of a guiding court rule. Most importantly, though, allowing Taha to prevail in this case based on the dissent's waiver argument would produce a result that is directly contrary to the law—a judgment in favor of Taha based on woefully insufficient evidence and at odds with the jury's other legal conclusions. *See Los Angeles Nut House* [*v. Holiday Hardware Corp.*], 825 F.2d [1351,] 1356 [(9th Cir. 1987)] (disfavoring the "waiver" theory because it permits a result contrary to the law). We refuse to accept such an outcome under the present circumstances.

378 Md. at 492.

Here, the $10,000.00 verdict on the conversion count should not be allowed to stand because it is at odds with the jury's economic damage finding as to Count I. Waiver is defined as giving up a known right. Based on *Taha*, a competent lawyer in a civil case would not have known that he or she was giving up the right to object to an irreconcilably inconsistent verdict by failing to object before the jury was discharged. Therefore, it cannot be said that the issue was waived.

In the subject case, the trial judge also ruled that the appellants had waived the inconsistent verdict argument by failing to object to the form of the verdict sheet. As far as we can see, there was nothing wrong with the verdict sheet. At the point where the case went to the jury, it was possible that the jury could find that there was a conversion but no violation of the statute. It was necessary for the verdict sheet to allow for such a contingency.

For the above reasons, we hold that the verdicts were irreconcilably inconsistent and that counsel for appellants did not waive the issue of irreconcilable verdicts. We shall remand this case to the Circuit Court for Baltimore City with instructions to vacate the $10,000.00 judgment entered in favor of appellees as to the conversion count.

## VII.

## ISSUE V – ATTORNEYS' FEES

Appellants' final argument is that the trial judge erred in assessing attorney's fees against "defendants where the award of fees was a multiple of the underlying award of damages." Appellants stress that appellees were only entitled to receive attorney's fees for pursuing the statutory claim, i.e., RP § 8-216, and as to that claim were only awarded $18,000.00, yet the attorney's fees awarded were almost four times that amount. In this appeal, and in the trial court, appellants contended that it was error for the trial judge to make an award of attorney's fees that was in excess of the amount the Hawkinses recovered in damages. In support of that contention, appellant cites three cases: *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *Ochse v. Henry*, 216 Md. App. 439

39

(2014); and *Frankel v. Friolo*, 170 Md. App. 441 (2006). None of the cases cited stand for the proposition advocated by appellants.

In *Johnson*, the Court addressed the considerations that were proper for an award of attorney's fees under Title VII of the Civil Rights Act of 1964. 488 F.2d at 715. The Court set forth twelve guideline factors that the trial court should consider, on remand, in determining the issue of what attorney's fees were reasonable. *Id*. at 717-19. Those twelve guidelines, with some minor changes, now are set forth in Md. Rule 2-703(f)(3) and read:

(A)  the time and labor required;

(B)  the novelty and difficulty of the questions;

(C)  the skill required to perform the legal service properly;

(D)  whether acceptance of the case precluded other employment by the attorney;

(E)  the customary fee for similar legal services;

(F)  whether the fee is fixed or contingent;

(G)  any time limitations imposed by the client or the circumstances;

(H)  the amount involved and the results obtained;

(I)  the experience, reputation, and ability of the attorneys;

(J)  the undesirability of the case;

(K)  the nature and length of the professional relationship with the client; and

(L)  awards in similar cases.

The appellants quote *Johnson* as follows: "In no event, however, should the litigant be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount." The excerpt from *Johnson* does not support appellants' argument because, here there was no evidence that the appellees entered into a contract with their attorneys as to the amount of fees that would be charged. In fact, it is likely that in a case of this nature, where the plaintiffs were of limited financial means, counsel for the appellees would have agreed that in the event the suit was successful, they would seek recompense from the appellants pursuant to RP § 8-216.

*Ochse*, 216 Md. App. at 448, unlike the present case, did not deal with a fee-shifting statute; instead, it dealt with a contract containing a fee-shifting provision which provided that if a party breached his/her contractual obligation to convey marketable title to the purchasers (the Ochses), then the Ochses would be entitled to an attorney fee award.

In *Ochse*, we said:

> The Court of Appeals has drawn a firm line between contractual fee-shifting cases, which arise out of a private agreement, and statutory fee-shifting cases, which involve some overriding public policy. <u>Statutory fee awards generally make use of the lodestar approach, by which the court simply multiplies the time an attorney spent on a case by a reasonable hourly rate and then adjusts the result up or down to arrive at a reasonable award based on the circumstances of the case and after considering factors such as the twelve enumerated in *Johnson v. Georgia Highway Express, Inc.*,</u> 488 F.2d 714, 717-19 (5th Cir. 1974). *See Friolo v. Frankel*, 373 Md. 501, 528-30 (2003). Although statutory fee-shifting provisions "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client," they are intended "to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific . . . laws" by assuring an attorney "that he will be paid a 'reasonable fee.'" *Friolo*, 373 Md. at 526 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S.

41

546, 565 (1986)).  In other words, statutory fee-shifting provisions are designed to encourage attorneys to take on cases that might otherwise be financially undesirable but which serve some greater, legislatively-established, social purpose.

In contractual fee-shifting cases, the Court of Appeals has rejected the lodestar approach in favor of an approach based on Maryland Lawyers' Rule of Professional Conduct l.5 [now Rule 19-301.5], in part to discourage awards that bear no rational relationship to the work a case reasonably requires of an attorney or the amount at issue in the litigation.

> [U]nlike the lodestar method, Rule 1.5 does not carry with it the notion that the importance of the right vindicated will justify an expenditure of attorney time that is hugely disproportionate to the dollar amount at issue in the case. Indeed, *when applying Rule 1.5, trial judges should consider the amount of the fee award in relation to the principal amount in litigation, and this may result in a downward adjustment.*  Although fee awards may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated.

*Monmouth Meadows Homeowners Ass'n v. Hamilton*, 416 Md. 325 (2010) (emphasis supplied).

216 Md. App. at 456-57 (footnote omitted).

Appellants cite the *Ochse* case for the proposition that it endorsed legal principles set forth in the *Johnson v. Georgia Highway* case.  In *Ochse*, the only mention of the *Johnson* case is in the portion of the excerpt quoted above that we have emphasized. Nothing in the *Ochse* case suggests that in a statutory fee-shifting case, the ultimate attorney fee award cannot be a "multiple" of the actual damages recovered on behalf of the plaintiff.

As indicated in the portion of *Ochse* just quoted, when dealing with the award of attorney fees based on a fee-shifting statute, the "lodestar approach" should be used.  And in this case, the trial judge followed that approach.

42

*Frankel v. Friolo*, 170 Md. App. 441, ("*Friolo I*"), is one of several Maryland appellate decisions that arose out of a fee dispute between Douglas Frankel (defendant) and Joy Friolo (plaintiff). In *Friolo I,* we vacated the award of attorney's fees and remanded the case to the Circuit Court for Montgomery County for further proceedings consistent with our opinion. *Id*. at 457. In their brief filed in this Court, appellants rely on the following language used in the *Friolo I* decision:

> "[t]he suggestion that counsel is entitled to fees in excess of $125,000 in obtaining a judgment of less than $12,000, where the client has been made whole, and where the additional fees have been generated *only* by counsel's continued litigation of its dissatisfaction with the fee awarded by the [c]ircuit [c]ourt, is untenable. It is, in a word, outrageous."

*Friolo*, 170 Md. App. at 456-57.

The language just quoted has no application in this case because the attorney's fees awarded were not, in any sense, "generated" by counsel's continued litigation of their dissatisfaction with the fee awarded by the circuit court. In any event, the plaintiff in *Friolo I* filed a petition for a writ of *certiorari* to review our decision on the issue of attorney fees. The Court of Appeals granted the petition and issued its decision in *Friolo v. Frankel*, 403 Md. 443 (2008), ("*Friolo II*"). The *Friolo II* Court agreed with us that the trial court "failed to provide an explanation of *how* [the lodestar] factors affected the amount of the award, thereby erring as a matter of law." *Id*. at 454-55. The Court of Appeals went on to explain that attorney fee awards for appellate work are justified by the same logic justifying trial fee awards:

> It is as important to compensate counsel for ensuring that the trial court gets it right, even if to do so requires counsel to appeal, as it is to ensure that counsel is compensated for services rendered at trial. Indeed, it is a

disincentive to the retention of competent counsel in these kinds of cases to deny recovery for successful appellate advocacy, including advocacy that demonstrates trial error.

*Id*. at 458. Nothing in either *Friolo I or II* supports appellant's argument.

In the trial court, appellants did not contend that the hourly rate charged by counsel for the appellees was unreasonable nor was there any challenge to the number of hours expended by appellees' counsel in presenting their case. When the lodestar approach is used, it is not at all surprising, or even unusual, that the ultimate fee awarded would be more than the amount recovered by the client. That such an award may be tolerated is because the legislature, in enacting fee-shifting statutes, wanted to "encourage attorneys to take on cases that might otherwise be financially undesirable but which serve some greater, legislatively-established, social purpose." *Ochse*, 216 Md. App. at 456. Here, the trial judge considered the twelve factors set forth in Md. Rule 2-703(f)(3) that the court was required to consider when deciding whether to award attorney fees, and the amount thereof. *See Pinnacle Group LLC v. Kelly*, 235 Md. App. 436, 477 (2018) and *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 426 (2016) (when a request for attorney fees is made, the circuit court must follow the procedures set forth in Md. Rule 2-703 and state the basis for grant or denial of an attorney fees award).

In the subject case, the trial judge wrote, in pertinent part:

[T]his [c]ourt finds that the request for attorneys' fees is reasonable in light of the factors set out in Maryland Rule 2-703. Several of the factors significantly weigh in favor of a grant of the requested attorneys' fees. For example, Plaintiffs' counsel spent substantial time and efforts on this case, as contemplated by subsection (A) [of Rule 2-703]. Plaintiffs' counsel responded to numerous interrogatories and requests for production of documents. *See* Plaintiffs' Petition, Exh. 2. Plaintiffs' counsel also

44

interviewed witnesses in the investigation of Defendants' claims. *Id*. Plaintiffs' counsel also had several meetings with Plaintiffs. *Id*. Plaintiffs' counsel also drafted and filed several pre- and post-trial documents. *Id*.

Additionally, the novelty and difficulty of the Maryland Real Property § 8-216, relevant to subsection (B), is such that an award of the attorneys' fees requested is appropriate. The statute became effective on June 1, 2013, and there has since been little case law written on it. Indeed, Plaintiffs researched the legislative history to interpret the statute and to present arguments to the [c]ourt and the jury regarding its purpose.

Subsection (D), examines whether handling this case precluded other paid work. Considering that counsel recorded 228.40 hours, they were naturally precluded from handling other matters. As to subsection (E), on the issue of whether counsel's fee is customary, this [c]ourt finds, and Defendants do not dispute, that the requested fees are in line with the guidelines set forth by the United States District Court for the District of Maryland. Additionally, the fees were judicially approved in *Curtis v. Blue Ocean Realty, LLC*, case no. 24-C-16-006490 (Balt. City Cir. Ct. 2018). Consideration of subsection (L), regarding the amount of attorneys' fee awards in like cases, also leads this [c]ourt to find the attorneys' fees warranted. For example, in *Blue Ocean Bristol, LLC v. Felicia Lockett*, case no. 24-C-14006572 (Balt. City. Cir. Ct. 2016), a tenant prevailed on retaliatory eviction claim and was awarded $2,511 in damages, and her attorneys were awarded $53,665 in attorneys' fees and $145.00 in costs.

Appellants complain that the trial judge gave "no concrete reason" why "an award in the amount of $68,000+" should be allowed, nor did the court:

squarely address[] the issue of why such an award, a multiple of the $28,000 underlying jury verdict (putting aside, for the moment as to whether that amount had been correct or justified), was consistent with the admonitions advanced within the *Johnson*, *Ochse*, *or Friolo* [*I*] opinions.

It is all the worse when considering the fact that Mr. and Mrs. Hawkins were not the sort of litigants that the General Assembly, enacting RP § 8-216, could have sought to protect. This was an instance in which [Maryland Property Management] attempted to use the processes of the district [c]ourt; and in which M[r]s. Hawkins specifically said that she wanted to leave the house.

45

The trial judge, in her written opinion, expressly recognized that she was required to consider the degree of success by the plaintiffs but rejected appellants' argument that "it is impermissible for an attorney's stake in the litigation to exceed the client's stake, and [therefore] . . . the [c]ourt should consider the amount of the fee in relation to the principal amount in litigation." In this regard, the trial court said:

> The [c]ourt declines to use a contingency-fee or proportionality-based approach to calculating the reasonableness of the attorneys' fees sought. *Stevenson v. Branch Banking and Trust Corp.*, 159 Md. App. 620, 666 (2004) (citing *Blaylock v. Johns Hopkins Fed. Credit Union*, 152 Md. App. 338, 355-56 (2004)).

The trial court did not err in rejecting appellant's "proportionality approach." In *Blaylock v. Johns Hopkins Fed. Credit Union*, 152 Md. App. 338, 359 (2003), we said:

> It is, of course, true, as the trial judge pointed out, that in ordinary civil litigation, where no fee-shifting statute exists, a litigant "would not pay $50,000 to . . . [get back] $8,000." But that appears to be the precise reason why the legislature included in the Consumer Protection Act a provision for fee shifting. If we were to approve the proportionality rule, consumers, such as Ms. Blaylock, who are engaged in civil litigation with a financially superior foe, would have no meaningful right to obtain legal recourse. Upon remand, the trial court can, of course, take into consideration the degree of Ms. Blaylock's counsel's success, but a strict rule of proportionality may not be applied.

We turn next to appellants "intent of the General Assembly" argument. The jury had before it evidence from which it could legitimately conclude that the appellants tried to use self-help rather than the processes of the district court to achieve their goals of evicting tenants, under such circumstances it cannot be said that appellees were not the sort of tenants that RP § 8-216 was designed to protect.

Lastly, appellants complain that the attorneys' fees were too high because the case could have been resolved in the District Court of Maryland for Baltimore City with much lower fees and more efficiency, yet counsel for appellees made the "calculated" decision to try the matter in the circuit court. A similar argument was made and rejected by us in *Blaylock*, 152 Md. App. at 359. Here, as in Blaylock, there was good reason for appellees to file suit in the circuit court. If the case had been filed in the district court, discovery would have been limited. *Id.* But here, as the trial judge pointed out in her opinion, the "discovery phase of the litigation was robust[.]" Under such circumstances, the fact that the appellees decided to ask for a jury trial and litigate this matter in the circuit court was not a legitimate reason to reduce the award of attorney's fees.

For the above reasons, we reject appellants' argument that the trial court erred in its attorney fees award.

Finally, in their brief, appellees request, pursuant to *Friolo v. Frankel*, 438 Md. 304 (2014), (*Friolo III*), that this case be remanded to the circuit court so that the trial court can consider whether to award attorneys' fees incurred in this appeal. Under *Friolo III*, a remand for that purpose is required. *Id.* at 329.

**MOTION TO DISMISS APPEAL DENIED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO: 1) VACATE THE $10,000.00 JUDGMENT ENTERED AS TO THE CONVERSION COUNT; 2) CONSIDER WHAT ATTORNEYS' FEES AND COSTS, IF ANY, APPELLEES ARE ENTITLED TO RECOVER FOR WORK PERFORMED AND EXPENSES INCURRED IN THIS APPEAL; JUDGMENTS OTHERWISE AFFIRMED; COSTS**

47

**TO BE PAID ONE-THIRD BY APPELLEES AND TWO-THIRDS BY APPELLANTS.**